**UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CIVIL ACTION NO. 12-23-DLB-JGW**

**SMA PORTFOLIO OWNER, LLC, et al.**                    **PLAINTIFFS**

**V.**

**CORPOREX REALTY & INVESTMENT, LLC, et al.**          **DEFENDANTS**

<u>**REPORT AND RECOMMENDATION**</u>

**I.  Introduction**

On January 20, 2012, Chief Judge Dlott transferred this case from the Southern District of

Ohio to this Court.  Doc. 45.  Pending at the time of the transfer were a motion to dismiss for failure

to state a claim filed by counter-defendant Bank of America ("the Bank") [Doc. 27] and

defendants/counterclaim-plaintiffs' joint motion for leave to file a second amended counterclaim.

Doc. 40.  On January 31, 2012, the presiding district judge referred both the motion to dismiss and

the motion for leave to file a second amended counterclaim to me for preparation of a report and

recommendation.  Doc. 55.  After hearing oral argument from counsel, and after having reviewed

the record and applicable law, I recommend that the motion to dismiss be granted in part and denied

in part and the motion for leave to file a second amended counterclaim be denied.

**II.  Factual and Procedural History**

This case is an action to collect against defendant Corporex Realty & Investment, LLC

("Corporex") as guarantor of three purportedly defaulted promissory notes.  The debtor on the first

note, which had an original principal amount of $9,700,000 and was made in January 2008, is CPX

Tampa Gateway OPAG, LLC ("CPX Tampa").  Doc. 1-1, p.2.  The maturity date on that note was

February 1, 2011.  *Id.*  Corporex agreed to be a guarantor on that CPX Tampa promissory note in

1

January 2008. *Id.* at p.22. The guaranty provides that it "is governed as to validity, interpretation, effect and in all other respects by laws and decisions of the State of Ohio." *Id.* at p.29. It is undisputed that the CPX Tampa note was not repaid by its February 2011 maturity date. The Bank declared the CPX Tampa note to be in default on March 5, 2011. Plaintiff SMA Portfolio Owners, LLC ("SMA") was assigned the CPX Tampa note in September 2011.

The debtor on the second amended promissory note, which had an original principal amount of $11,250,000 and was made in December 2005, is CPX Olympic Building, II LLC ("CPX Olympic"). *Id.* at p.43. The CPX Olympic promissory note was modified in October 2010 to change the maturity date from October 31, 2010 to February 1, 2011. *Id.* at p.60. Corporex was also a guarantor on the CPX Olympic promissory note. The guaranty also provides that it is to be governed by Ohio law. *Id.* at p.78. It is undisputed that the promissory note was not repaid by its February 2011 maturity date. The Bank declared the CPX Olympic note to be in default on March 5, 2011. SMA was assigned the CPX Olympic note in September 2011.

The debtor on the third note is CPX Madison Place Office, LLC ("CPX Madison"). That note was made in October 2006 and had an original principal amount of $33,500,000 and a maturity date of October 31, 2011. *Id.* at p.92. The note required CPX Madison to "achieve a Debt Service Coverage Ratio . . . of at least 1.0 to 1.0 as of August 31, 2009 and 1.10 to 1.0 as of August 31, 2010." *Id.* at p.104. Corporex guaranteed the CPX Madison note. As with the other two guaranties, the guaranty for the CPX Madison note provides that it is governed by Ohio law. *Id.* at p. 117. It is undisputed that CPX Madison failed to obtain the requisite 1.10 to 1.00 debt service ratio in August 2010. The Bank declared the CPX Madison note to be in default on November 30, 2010.

In June 2011, the Bank filed this action against Corporex in the Cincinnati Division of the

United States District Court for the Southern District of Ohio. Doc. 1. Corporex filed its answer and counterclaim against the bank in August 2011. Doc. 4. Later in August 2011, Chief Judge Dlott granted a motion to intervene as defendants/counterclaim plaintiffs by CPX Olympic and CPX Madison. Doc. 10. CPX Tampa did not move to intervene.

In October 2011, Corporex, CPX Olympic and CPX Madison filed an amended counterclaim against the Bank. Doc. 25. The essence of the counterclaim is that the Bank promised to renegotiate the loans but reneged on promises or agreements in principle at the eleventh hour. Specifically, the counterclaims are for: 1) breach of the duty of good faith and fair dealing; 2) promissory estoppel; 3) breach of contract; 4) breach of fiduciary duty; and 5) conversion.

In November 2011, the Bank filed the pending motion to dismiss the counterclaims for failure to state a claim. Doc. 27. Shortly thereafter, SMA, who is the assignee of the loans/notes to CPX Tampa and CPX Olympic, was granted leave to be substituted as plaintiff for the counts pertaining to the guaranties for the notes to CPX Tampa and CPX Olympic. Doc. 34. The Bank remains plaintiff for the count of the complaint pertaining to the CPX Madison note, and the Bank is the counterclaim defendant.

In December 2011, CPX Madison, CPX Olympic and Corporex (collectively "defendants") filed the pending joint motion for leave to file a second amended counterclaim. Doc. 40. Defendants seek to add a cause of action for breach of contract due to the Bank's and SMA's failure to provide defendants the opportunity to exercise the right of first refusal to purchase the CPX Olympic and CPX Tampa promissory notes. Doc. 40-1, p. 23-25. While the motion for leave to file a second amended counterclaim was being briefed, Chief Judge Dlott sua sponte transferred the case to this Court. Doc. 45. Both the motion to dismiss and the motion for leave to file second amended

counterclaim are now fully briefed.

In August 2011, the Bank filed foreclosure actions for the Kentucky properties which are at issue in the 12-cv-23 guarantor enforcement action against Corporex. Case number 11-cv-168 seeks to foreclose on the CPX Madison building in Covington for which a security mortgage was executed in conjunction with the aforementioned promissory note; case number 11-cv-169 seeks to foreclose on the CPX Olympic Building located in Hebron for which a security mortgage was executed in conjunction with the aforementioned promissory note.[1]

The Domaine de la Rive Condominium Council of Co-Owners has been granted leave to intervene in case number 11-cv-168. Doc. 41. In November 2011, SMA was granted leave to be substituted as the plaintiff in 11-cv-169. Doc. 25. Counterclaims against the Bank were filed in both 11-cv-168 and 11-cv-169. The Bank has filed a motion to dismiss counterclaims in both cases. Doc. 29 in case 11-168; Doc. 30 in case 11-169. In addition, SMA has filed a motion to dismiss or sever the counterclaims in case 11-cv-169. Doc. 37.

The parties have agreed that case number 12-cv-23 should be the lead case because it was filed first and because the counterclaims have been amended once and defendants are seeking to amend them a second time. This report and recommendation will discuss only the issues presented in the motions in case 12-cv-23. The outcome of the motions to dismiss in cases 11-cv-168 and 11-cv-169 will be foreordained by the ultimate resolution of the motions pending in case 12-cv-23.

**III. Analysis**

**A. Motion to Dismiss**

---

[1]Because the CPX Tampa property for which a security mortgage was given in conjunction with the aforementioned promissory note is located in Florida, no foreclosure proceeding regarding that property is pending in this Court.

4

### 1. Standard of Review

"In deciding a Rule 12(b)(6) motion, a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted).

A court need not accept as true legal conclusions in a complaint. *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Even legal conclusions "couched as factual allegations" are insufficient to survive a motion to dismiss. *Center v. Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 129 S.Ct. at 1950. In other words, "[m]erely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient." *Patterson v. Novartis Pharmaceuticals Corp.*, 2011 WL 3701884, at *1 (6th Cir. Aug. 23, 2011).

### 2. The Releases

The Bank contends the first two counterclaims (breach of duty of good faith and fair dealing and promissory estoppel) are barred by written releases entered into during the negotiation of

5

extensions or modifications of the loan agreements (promissory notes).  In pertinent part, each release contains a clause providing: "[e]ach party hereto hereby completely, irrevocably and unconditionally releases and forever discharges the other party from any and all liabilities, claims and demands whatsoever, in law or in equity, which such releasing party now has or may hereafter have against the other party caused by or arising out of or relating to all or any Loan Communications . . . ."  Doc. 28-10, p.3, p.8, p.12.  Loan Communications are defined in the releases as "[a]ny discussions, negotiations, correspondence and other communications relating to the Loan and the Loan Documents that Borrower, Guarantor and/or their representatives may have previously had, or in the future may have, with representatives of Lender . . . ."  *Id.* at p.3, p.7-8, p. 11-12.  Though the guaranties provide that they are to be governed by Ohio law, the release language provides that the releases "and all issues arising hereunder" shall be governed by Kentucky law.[2]  Doc. 28-10.

Despite being referred to as releases in the pleadings, the "releases" are letters from the Bank to William Butler, CEO of CPX Madison Place/President of CPX Tampa/Chairman and CEO of Corporex/President of CPX Olympic.  Butler signed all three releases but no representative of the Bank signed the copies of the releases regarding CPX Tampa and CPX Olympic which were originally provided to the Court.  *See* Doc. 28-10.  Subsequent to the oral arguments conducted on

---

[2]The CPX Madison release as typed provides that Ohio law governs it but the word Ohio is scratched out and a handwritten "KY" is written above it.  Doc. 28-10, p.5.  There are no additions or deletions in the clause providing for Kentucky law to apply in the CPX Tampa or the CPX Olympic releases.  *Id.* at p.10, 14.  Though defendants argue that discovery is needed on which law applies, especially in light of the deletions and additions in the CPX Madison release, there has been no showing that there is a material difference between Kentucky or Ohio law necessitating discovery.  *See, e.g., Limbright v. Hofmeister*, 2010 WL 3385346, at *4 (E.D.Ky. Aug. 25, 2010) ("If the laws of both states would produce the same result, there is a 'false conflict' and no further [choice of laws] analysis is necessary.").

6

the pending motions, however, counsel for the Bank provided copies of the CPX Tampa and CPX

Olympic releases which were signed by a representative of the Bank. *See* Doc. 64-1, p.7-10, 11-14.

Since the record now contains signed copies of all three releases, I will not belabor this report and

recommendation by analyzing in detail defendants' argument that the lack of signatures by the Bank

renders the CPX Tampa and CPX Olympic releases ineffective.[3]

A valid release of the claims contained in a complaint does provide grounds for granting a

motion to dismiss under Rule 12(b)(6). *See, e.g., Superior Care Pharmacy, Inc. v. Medicine Shoppe*

*International, Inc.*, 2011 WL 597065, at *13 (S.D.Ohio Feb. 10, 2011) ("Since Fed.R.Civ.P. 8

categorizes release as an affirmative defense, that defense may be raised in a motion to dismiss

under Rule 12(b)(6) when the defense is shown by the face of the complaint.").   Defendants do not

dispute the veracity or applicability of the releases to their claims.   Instead, defendants raise

procedural-type arguments against the applicability of the releases.

First, defendants argue that the Court should not consider the releases when ruling on the

motion to dismiss because the releases are not mentioned in the counterclaims. *See* Fed.R.Civ.P.

12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to

---

[3]Counsel for the Bank states in a declaration accompanying the late-found releases that
the signed CPX Tampa and CPX Olympic releases were possessed by the Bank's national
coordinating counsel "before the date of the Defendants' response brief, wherein the question of
execution was first raised." Doc. 64, p.2. Counsel for the Bank stated that he "had not
previously inquired upon Bank of America or Bryan Cave, LLP [the Bank's national counsel] for
the fully-executed copies given Bank of America's position that the releases are enforceable even
if there [sic] were not signed by Bank of America." *Id.*
In any event, the Bank could have sought to enforce the releases even if they were
unsigned by a representative of the Bank. *See, e.g., Vaughn v. Rehab One, Inc.*, 1994 WL
91198, at *2 (Minn.Ct.App. March 22, 1994) ("A contract may be binding on a party even
though not signed by him. Assent or mutuality can be shown by the fact that the parties accepted
the writing as a binding contract and acted on it as such, even though it was not signed.").

and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Defendants' argument to the contrary notwithstanding, the fact that the releases are not mentioned in the counterclaims does not absolutely bar the Court from considering them as part of this Rule 12(b)(6) motion because "[w]here the plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading." *Superior Care Pharmacy,* Inc., 2011 WL 597065, at *12 (citing *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999)). *See also Yak v. Bank Brussels Lambert, BBL (USA)*, 252 F.3d 127, 130-31 (2nd Cir. 2001) (holding that district court was permitted to consider a document when ruling on a motion to dismiss if the document was integral to the complaint, yet the plaintiff "[c]arefully avoid[ed] all mention" of the document); *Wyser-Pratte Management Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (holding that in ruling on a Rule 12(b)(6) motion "[i]n addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint.").

Defendants' noticeable failure to mention the releases in their counterclaims gives rise to an inference that the pleading was crafted to "carefully avoid" mentioning the releases, especially since defendants have not raised specific objections to the accuracy or general applicability of the releases to the counterclaims. *Yak*, 252 F.3d at 130-31. Indeed, it is indisputable that the releases are directly relevant to the counterclaims. Accordingly, I conclude that the releases are integral to the resolution of the counterclaims and, as such, should be considered in the course of the Court's ruling on the motion to dismiss without converting the motion to a motion for summary judgment.

Second, defendants contend that the Court should permit the parties to conduct discovery as to the nature and scope of the releases. Specifically, defendants contend discovery is necessary to

determine what, if any, consideration the Bank gave to support the releases.  However, the consideration requirement is satisfied by the fact that the Bank agreed to negotiate a restructuring or extension of the loans–which it did not have to do-- in return for defendants agreeing to the release terms.  *See, e.g., In re Vargas Realty Enterprises, Inc.*, 440 B.R. 224, 237 (S.D.N.Y. 2010) ("The law is equally clear that a bargained-for agreement to negotiate when there is no legal obligation to do so is fair consideration.").  In addition, the releases contain mutual promises in that both the Bank and defendants agreed to release the other from claims and liabilities pertaining to the reworking of the loans.  Under both Ohio and Kentucky law, mutual promises are sufficient consideration.  *See, e.g., Moore v. Carnes*, 214 S.W.2d 984, 991 (Ky. 1948) ("this court has consistently held that mutual promises form a valid consideration for the agreement but in order for that to be so there must be a benefit to the promisor or a detriment to the promisee."); *Randleman v. Fidelity Nat. Title Ins. Co.*, 465 F.Supp.2d 812, 821 (N.D.Ohio 2006) ("In Ohio, mutual concurrent promises may be consideration for each other.").  Though defendants argue that the Bank had no claims against them to relinquish, rendering a promise to release nonexistent claims illusory, that argument must fail as there was no way for the Bank to know at the time it entered into the release agreements whether defendants would  engage in actionable conduct during the loan reworking negotiations.  The broad language of the release providing for mutual relinquishment of "any and all" claims–including claims which would accrue in the future--is unmistakably plain.  Finally, defendants have pointed to no discrepancies between Ohio and Kentucky law sufficient to necessitate discovery or further briefing or argument, nor have defendants demonstrated any specific factual issues regarding their lack of knowledge of the terms and effects of the releases.

The plain language of the releases bars defendants counterclaims for breach of duty of good

faith and fair dealing, and for promissory estoppel.  I recommend that the motion to dismiss those two counterclaims be granted.

### 3.  Breach of Duty of Good Faith and Fair Dealing

At its core, defendants' counterclaim accuses the Bank of breaching the duty of good faith and fair dealing by inserting deal-breaking clauses into the loan reworking negotiations at the eleventh hour.  In addition to being barred by the releases, this counterclaim fails under both Ohio and Kentucky law.  Under Kentucky law, "while each contract implicitly contains a covenant of good faith and fair dealing, this covenant does not prevent contracting parties from exercising their contractual rights."  *Fifth Third Bank v. Waxman*, 726 F.Supp. 742, 749 (E.D.Ky. 2010) (citing *Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005)).  Ohio law is similar.  *Panagouleas Interiors, Inc. v. Silent Partner Group, Inc.*, 2002 WL 441409, at *7 (OhioCt.App. March 22, 2002) (holding that breach of duty of good faith and fair dealing not violated because creditor not required to satisfy debtor's desire to refinance debt).  The Bank has acted in accordance with its contractual rights by seeking to recover on the guaranties, and the fact that the Bank proposed terms to rework the loans which were not agreeable to defendants does not give rise to a claim for breach of the duty of good faith and fair dealing.

### 4.  Promissory Estoppel

Defendants' next counterclaim is for promissory estoppel.  Defendants contend that during the negotiations of extending/modifying the loans, the Bank promised to "work with" defendants and that in reliance upon that false promise defendants "among other things, passed over refinancing opportunities that were available to them."  Doc. 39, p.18.  Defendants rely upon the principle that "[a]n action for damages under promissory estoppel provides an adequate remedy for an unfulfilled

or fraudulent promise . . . . [P]romissory estoppel is an adequate remedy for a fraudulent oral promise or breach of an oral promise, absent a signed agreement." *Olympic Holding Co., LLC v. ACE Ltd.,* 909 N.E.2d 93, 100-101 (Ohio 2009).

Defendants cannot enforce the alleged promises made by the Bank due to application of the statute of frauds. Instead, defendants seek to recover reliance damages for acts they took, or refrained from taking, in reliance upon the Bank's alleged promises. Such reliance damages are recoverable even if the promises themselves are not enforceable due to application of the statute of frauds. *Id.* at 100 ("we hold that a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds, which requires that an enforceable contract be in writing and signed by the party to be charged, but may pursue promissory estoppel as a separate remedy for damages.").

The counterclaims contain no factual allegation or specification as to what the alleged reliance damages would be. Failure to plead damages with any degree of specificity is fatal to a claim. *See, e.g., Eichholz v. Wells Fargo Bank, NA*, 2011 WL 5375375, at *5 (E.D.Mich. Nov. 7, 2011) ("Merely claiming to have suffered damages, without more, epitomizes conclusory pleading."); *Ashcroft*, 129 S.Ct. at 1949 (generally holding that to be viable a complaint may not rest on conclusory statements alone). Given the fatal vagueness of the counterclaim, I decline to discuss at length the Bank's alternate arguments regarding dismissal under the parol evidence rule or whether defendants' reliance was unreasonable as a matter of law. Instead, I only briefly note that both the promissory notes, the guaranties and the releases generally provide that their terms may only be modified in writing and/or that no party may be deemed to have waived any of its contractual rights unless it does so in writing. Although the issue of whether a party's reliance was

11

reasonable may usually be a question for the jury, a court may sometimes determine whether reliance is reasonable when ruling on a motion to dismiss.  *See HMS Property Management Group, Inc. v. Miller*, 69 F.3d 537, at *3-4 (Table) (6th Cir. 1995).  Given the clear language of the contracts at issue in this case regarding the necessity of amendments being in writing, and the fact that both defendants and the Bank are sophisticated commercial entities, I conclude that defendants' claimed reliance upon any alleged oral promises by the Bank should be deemed unreasonable as a matter of law.[4]

-------------------

[4]As memorably stated by the United States Court of Appeals for the Second Circuit: Under our law of contracts parties are free, within certain limits, to set the conditions under which their agreements will become binding. Sometimes an oral promise or handshake is all that is needed, but when substantial sums of money are at stake it is neither unreasonable nor unusual for parties to require that their contract be entirely in writing and signed before binding obligations will attach. In the present case the parties set exactly that requirement, and they did so in such a forthright, plain manner that there is no issue left to be tried. The case does not even present much of a cautionary tale: its lesson is simply that when experienced businessmen and lawyers are told explicitly and clearly that a major and complex agreement will be binding only when put in writing, then they should be rather cautious about assuming anything different. . . .

      Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception. . . .

      To begin with, it is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement.

*R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 71, 75 (2nd Cir. 1984).  Though *R.G. Group, Inc.* involved the propriety of summary judgment, its forceful language is equally

### 5. Disclosure of Confidential Information

In relevant part, the breach of confidential information count of the counterclaim (Count III) provides: "Bank of America breached its contractual obligations to Olympic LLC and Madison Place LLC, by providing their confidential leasing information to third-party businesses in the Tri-State area. . . .  Madison Place LLC and Olympic LLC have been harmed by Bank of America's inappropriate disclosures and are entitled to damages in an amount which shall be proven at trial." Doc. 25, p.21.  I agree with the Bank that Count III should be dismissed as having been inadequately pled.

As can be seen from the quoted portion of the counterclaim, this Count is the sort of conclusory, "unadorned, the-defendant-unlawfully-harmed-me accusation" which the Supreme Court held insufficient in *Ashcroft*.  129 S.Ct. at 1949.  In addition, the damages claim is also fatally conclusory.  *Eichholz*, 2011 WL 5375375, at *5.

Moreover, Section 8.9 of the three promissory notes permits the Bank to share information about defendants in a commercially appropriate manner in connection with a sale of the notes.  To wit:  "Borrower acknowledges and agrees that Lender may share information about the Borrower, in a commercially appropriate manner, with any of its subsidiaries or affiliates or their successors or any purchasers or potential purchasers of the Note evidencing the Loan."  Doc. 1-1, p.103. Defendants have not shown that the Bank's disclosure of information regarding tenants of the

---

applicable to this motion to dismiss.

properties for which the notes were made was commercially unreasonable.[5]  Instead, defendants merely state that "[t]he Bank breached that agreement when it acted in a commercially inappropriate manner by providing their confidential information to third-party businesses in the Tri-State area."  Doc. 39, p.21 (quotation marks omitted).  Noticeably lacking is any specificity as to how providing tenant lease information in connection with the sale of the promissory notes is commercially unreasonable.  Merely stating that the Bank's disclosure of information was commercially unreasonable or inappropriate without elaboration is insufficient.

### 6. Breach of Fiduciary Duty

Count IV is for a breach of fiduciary duty.[6]  Under both Kentucky and Ohio law, the relationship between a bank and customer or debtor and creditor generally does not create a fiduciary duty.  *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (Ky. 1991); *Groob v. KeyBank*, 843 N.E.2d 1170, 1173 (Ohio 2006).[7]  In situations involving a special

---

[5]Indeed, providing information about defendants' tenants does not even necessarily equate with providing information about defendants themselves.

[6]In relevant part, Count IV of the counterclaim provides: "Bank of America had a fiduciary duty to keep the leasing information of Madison Place LLC and Olympic LLC confidential and not to share it with third parties except only if done so to potential purchasers of Bank of America's interest in the loan documents and then only a commercially appropriate manner. . . . . Bank of America breached its obligation to keep the leasing information confidential by providing it, without Madison Place LLC's or Olympic LLC's consent, to third-party brokers in the local Tri-State area."  Doc. 25, p.21.
  The damages portion of Count IV of the counterclaim tersely alleges that "Madison Place LLC and Olympic LLC have been harmed by Bank of America's inappropriate disclosures and are entitled to damages in an amount which shall be proven at trial."  *Id.* at p. 22.  Count IV fails as a matter of law on other grounds, so I only note in passing that the damages claim of that count is fatally conclusory.

[7]In addition, an Ohio statute expressly provides that unless otherwise agreed in writing, the relationship between a bank and a debtor does not create a fiduciary relationship.  ORC 1109.15(E).

14

relationship between the parties, however, a bank or creditor may be deemed to have a fiduciary relationship with a customer or debtor. *Steelvest, Inc.*, 816 S.W.2d at 485; *Groob*, 843 N.E.2d at 1173.

As the Bank points out, however, defendants have failed to show with any degree of specificity whatsoever how the otherwise typical, arms-length relationship between the lender (the Bank) and the borrowers (the CPX entities) or the Bank and the guarantor (Corporex) in this case is so extraordinary as to constitute a special relationship sufficient to create a fiduciary duty on behalf of the Bank. The counterclaim's conclusory allegation that the Bank violated a fiduciary duty when it shared leasing information about tenants of defendants is woefully insufficient to show how the relationship between the Bank and defendants was so close as to create a fiduciary duty for the Bank, and an entity cannot violate a nonexistent duty.

Instead of demonstrating how their relationship with the Bank gave to fiduciary duties, defendants merely argue that the question of whether a fiduciary relationship exists should not be resolved on a motion to dismiss. *See, e.g., George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1049 (N.D.Ill. 2009) ("Because the determination of whether a person behaved in a fiduciary capacity often involves factual issues, courts have frequently declined to decide a defendant's fiduciary status on a motion to dismiss.").[8] But there can only be a factual issue if the pleadings are

---

[8]*George* involved the question of whether a defendant was a fiduciary with respect to an ERISA plan. Its utility to the vastly different facts and legal theories of this case is, at best, limited.

Defendants cite to *George*, from a federal court in Illinois, presumably to buttress their argument that Illinois law may apply because one of the Bank's representatives who dealt with defendants is employed in Illinois. Indeed, defendants even contend that North Carolina law may govern since the Bank is headquartered in that state.

*George* is of little help to defendants, however, because it involves whether a fiduciary relationship existed under federal, not Illinois, law. Moreover, all of the written documents at

sufficient to create one.  Simply making an unadorned and unsupported claim that their relationship with the Bank was somehow sufficiently close and  unique as to give rise to fiduciary duties is insufficient to overcome the general rule that such a relationship does not give rise to fiduciary duties.  Like the counts previously discussed, such conclusory allegations are insufficient.  *Ashcroft*, 129 S.Ct. at 1949 ("the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement.") (citations and quotation marks omitted).

### 7.  Conversion

In relevant part, Count V of the counterclaim provides:

91.  Bank of America has in its possession approximately $300,000.00
in a checking account that belongs to Olympic LLC. The Bank has classified the account as "inactive."
92. Olympic LLC demanded that Bank of America remit those funds to
it. Bank of America refused to return the funds with no explanation.
93. Bank of America is not entitled to retain these funds and its refusal
to return them is a conversion for which Olympic LLC is entitled to be compensated in damages.

Doc. 25, p.24.

The Bank contends that it is permitted to set off a bank account against the indebtedness of a depositor without the depositor's knowledge or consent.  *See, e.g., Walter v. National City Bank*

---

issue provide that they are to be governed by either Kentucky or Ohio law.  The Bank is a large entity with officers in many states, so the fact that one of the officers who dealt with defendants is employed in Illinois, or the fact that the Bank is headquartered in North Carolina, does not override the parties' express agreement that either Kentucky or Ohio law shall govern disputes arising under the relevant written agreements.  No choice of laws-related discovery is needed.

*of Cleveland*, 330 N.E.2d 425, 427 (Ohio 1975) ("As a general rule, the courts have held that a bank may set off a bank account against the matured indebtedness of its depositor . . . ."). Defendants acknowledge the general right of setoff but point out that a setoff is proper only if the debt is currently due at the time the setoff occurs. *See, e.g., id.* at 428 ("An unmatured debt is not presently due or collectible and is not available for setoff, since setoff would alter the contract made by the parties.").

Resolution of this issue appears to revolve around whether the CPX Olympic note was in default at the time of the setoff.  Defendants contend no default occurred because the Bank "engaged in commercially unreasonable and bad faith conduct and should be estopped from claiming that Defendants/Counterclaim Plaintiffs are in default."  Doc. 39, p.16, n.7.  In other words, defendants admit they did not comply with the repayment terms of the CPX Olympic note but claim there is no default because the noncompliance was caused by the Bank's improper conduct.  Because I have concluded that defendants' first four counterclaims concerning alleged misconduct by the Bank should be dismissed, I reject defendants' argument that no default occurred.

Even assuming the CPX Olympic note was in default, however, one crucial factual issue remains: did the Bank exercise its right to setoff before or after the note was defaulted.  If it did so after the note was defaulted, then defendants' conversion counterclaim must fail as the Bank would have been within its rights to control the account in question under general setoff principles.  If the setoff occurred prior to default, however, then the debt had not matured, meaning that the conversion counterclaim should not be dismissed.

At oral argument, I asked counsel when the Bank took over the account in question. Counsel was unable to provide a specific date.  Without knowing the specific date the setoff occurred, it

17

cannot be known whether the setoff occurred before or after the default.

Counsel for the Bank contended that dismissal was appropriate because defendants were required to specify the date of the conversion in their pleadings.  I disagree.  Defendants were required to set forth a facially plausible claim in their counterclaims.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949.  The counterclaim alleges that the Bank wrongfully took possession of  $300,000 in a checking account belonging to CPX Olympic and refused to either return the funds or offer an explanation for the takeover. Doc. 25, p. 22.  Accepting those factual allegations as true, defendants have pled a facially plausible claim for conversion.

The facial plausibility is destroyed only if the Bank took possession of the account following a default under the generally permitted right of setoff.  In other words, the right of setoff is a possible affirmative defense  the Bank could raise to the conversion claim.  Defendants, like any party, are not required to plead with an eye toward defeating all possible defenses.  As the Sixth Circuit has made plain, a party "need not anticipate every defense and accordingly need not plead every response to a potential defense." *Memphis, Tennessee Area Local, American Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004).  Even under the heightened pleading standard of *Ashcroft*, "a plaintiff is not required to anticipate and respond to every affirmative defense that a defendant may choose to assert. To find otherwise would require a complaint to address and overcome every possible affirmative defense." *Rumpz v. American Drilling & Testing, Inc.*, 2009 WL 3464826, at *6 (E.D.Mich. 2009).  In short, the Bank has not shown that defendants have failed to adequately plead a facially plausible cause of action.  There is a factual question

18

regarding the Bank's affirmative defense which may not be properly answered at this time.  I recommend the motion to dismiss this count of the counterclaim be denied..

### B.  Motion for Leave to Amend Counterclaims

### 1.  Nature of Proposed Amendment

As described by defendants, "[t]he proposed Amended Counterclaim is for the purpose of adding one additional claim in a new Count VI for breach of contract because Plaintiffs [the Bank and SMA] did not permit Olympic LLC or Tampa LLC to exercise their contractual rights of first refusal to purchase the Olympic LLC and Tampa LLC Notes, respectively, sold at a discount to SMA Portfolio Owner, LLC.   The proposed Amended Counterclaim also clarifies which counterclaims are against which plaintiff and whether as counterclaim, affirmative defense, or both." Doc. 40, p.3.  Section 8.9 of the relevant promissory notes, which is at issue in the proposed new counterclaim, provides in relevant part that "[l]ender [the Bank] agrees that in the event that it determines to assign or sell the Note . . . to any person or entity not affiliated with Lender, Lender shall, *provided Borrower is not then in default under this Note or any of the other Loan Documents*, allow Borrower or Borrower's affiliates a right of first refusal to purchase same . . . ."  Doc. 1-1, p.14, 53 (emphasis added).

### 2.  Standard of Review

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend a pleading] when justice so requires."  Amendment may be denied, however, if the proposed amendment is futile.  *See, e.g., Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 613 (6th Cir. 2005).  A proposed amended claim is futile if it would not survive a Rule 12(b)(6) motion to dismiss.  *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

19

### 3. Futility

As previously discussed, the counterclaims should be dismissed (except as to the conversion claim). Accordingly, the sections of the tendered amended counterclaim which are the same as the extant counterclaim are also subject to dismissal.

The proposed additional count of the tendered amended counterclaim is also subject to dismissal. First, CPX Tampa is not a party to case number 12-cv-23. Nonetheless, the tendered counterclaim seeks to recover damages from the Bank and SMA based upon their failure to comply with the right of first refusal clause as it pertains to both CPX Olympic (which is a party) and CPX Tampa (which is not a party). Defendants have not shown in their pleadings why they should be permitted to raise a breach of contract claim on behalf of a non-party.[9]

In addition, the proposed new cause of action is entirely dependent upon CPX Olympic and CPX Tampa not being in default when the notes were marketed and sold. As previously discussed, neither CPX Tampa nor CPX Olympic repaid the notes at their maturity dates. In addition, none of the counterclaims excuse the lack of timely repayment.[10] Consequently, as of March 5, 2011 the Bank declared both CPX Tampa and CPX Olympic to be in default. It is uncontested that SMA did not acquire the CPX Tampa and CPX Olympic notes until September 2011–over six months after the defaults were declared. In other words, leave to amend to raise this failure to comply with a contractual right of first refusal should be denied on futility grounds as a condition precedent to

---

[9]CPX Tampa is also not a party to cases 11-cv-168 or 11-cv-169.

[10]The conversion claim regarding CPX Olympic's bank account does not directly excuse that entity's failure to timely repay the promissory note.

triggering the right of first refusal (the notes not being in default) was not met.[11]

Finally, I do not think that amendment is necessary to plainly establish which aspects of the answer and counterclaims are defenses and which are counterclaims.  I have concluded that only the conversion count of the counterclaim should not be dismissed.  There should be no confusion, therefore, as to whether the legal theories raised by defendants are defenses or counterclaims.

### IV. Recommendation

For the foregoing reasons, it is **RECOMMENDED**:

1.  The motion to dismiss filed by the Bank of America [Doc. 27] should be **granted** as to Counts I-IV of the counterclaim and **denied** as to Count V (conversion); and

2.  The motion for leave to file a second amended counterclaim [Doc. 40] should be **denied**.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service or further appeal is waived.  Fed. R. Civ.

---

[11]At oral argument, counsel for defendants asserted that the Bank intended to sell the notes beginning in August 2010.  According to counsel, the right of first refusal clause is triggered as soon as the Bank intended to sell the note–not when the actual sale occurred.  Thus, counsel contended that the notes were not in default at the time the right of first refusal clause was triggered.  As written, the right of first refusal clause was triggered when the Bank "determines to assign or sell the Note . . . ." Doc. 1-1, p.14, 53.  A sale can only be consummated once all parties agree to all material terms, so the Bank could only really have determined to sell the note once it came to terms with a purchaser.  In addition, counsel admitted at oral argument that this precise argument had not been plainly addressed in the pleadings.  Moreover, defendants' counsel offered *nothing* concrete to buttress his supposition that the Bank had decided months before the loans matured that it wanted the notes to be in default so they could be sold to another entity.  As counsel for the Bank stated at oral argument, defendants' argument is illogical.  If the Bank was determined to let a default occur in order to sell the notes to someone other than defendants, why did it wait until September 2011--over six months after the defaults-- to consummate the sale(s) that it had purportedly been scheming to achieve since August 2010?  In addition, why would the Bank logically have granted an extension of the maturity date on the CPX Olympic note if it (the Bank) was anxious for that note to be in default?

21

P. 72(b)(2); *see also U.S. v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985).  A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)(citing *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991)).  Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal.  *Howard*, 932 F.2d at 509.  A party may respond to another party's objections within fourteen days of being served with a copy of those objections.  Fed. R. Civ. P. 72(b)(2).

This the 22nd day of March, 2012.

Signed By:

**J. Gregory Wehrman**

**United States Magistrate Judge**